Hope you don't get rained on. I'm sure you're aware that when you speak at the podium you can dispense with masks. We have three cases on the docket. We do appreciate your keeping in line with the timing regulations. The yellow light tells you have two minutes and when the red light comes on we ask you to conclude your remarks as quickly as possible unless you're answering a court. We have read the briefs and record excerpts. We have not necessarily gotten into the whole record and therefore we appreciate record citations when those are appropriate. The first case of the morning, this will wake us all up, number 230723 Goldring v. United States and we'll hear first from Miss Levin. We do take this seriously. Good morning, Your Honor. May it please the court, Michelle Levin on behalf of the appellants Jane and William Goldring. This appeal presents two nuanced issues of federal tax law. First, we've asked the court to decide the tax character of a 40 million dollar settlement that Sunbelt agreed to pay Mrs. Goldring in exchange for her claims to her Sunbelt stock, which the parties agree is a capital asset. Mrs. Goldring was forced to bring the litigation against Sunbelt when its board of directors conspired to push her out of the company and misappropriated her shares without offering her the fair value of her shares or even the opportunity to negotiate. In deciding the tax treatment of the settlement, this court has to decide whether Sunbelt can shift the tax burden associated with its acquisitions of Mrs. Goldring's Sunbelt shares by forcing this process into litigation and then recharacterizing the vast majority of the settlement as interest for tax purposes, which generated a ten million dollar tax benefit for Sunbelt and its shareholders and then imposed a five million dollar tax penalty on Mrs. Goldring. In short, who should bear the tax benefit and tax burden of Sunbelt's misconduct? If this court decides that Mrs. Goldring does ultimately owe that additional five million dollars in taxes, the second issue to be decided will be whether Mrs. Goldring should have to pay underpayment interest on that five million dollars, despite the fact that the government concedes that she paid the full five million dollars to the IRS with her 2010 return, that the IRS had full possession and use of the five million dollars throughout the course of the audit, and that those funds were never needed to pay any other tax liability. I'm going to begin with the first issue because the resolution in favor of the Goldrings on the first issue resolves the second issue. The facts are undisputed. Sunbelt pushed Mrs. Goldring out, its sole minority shareholder, forcing her to litigation in order to get the fair value of her Sunbelt stock, again, a capital asset, there's no dispute on that. Throughout the course of the 13 years of litigation that ensued, Mrs. Goldring repeatedly asked the court to award her equitable relief, including the return of her shares, which she never intended to part with in the first place, or a comparable 15 percent interest in current Sunbelts. Counsel, the operative date is August 22nd, 1997, isn't that correct? That's the date of the evaluation for purposes of the transaction where she was wronged? Yes, Your Honor, that is the date of the squeeze-out merger, you're correct. Okay, so if that's the date, and then there was a settlement, the word you just used was settlement, I realize that's part of why we're here, you used the word settlement in 2010. Yes, Your Honor. What is in the record to support the value of this settlement in 2010? In other words, how was that number derived? And the reason I'm asking you not to be tricky about it, obviously I'm asking you because it seems like that was. Yes, Your Honor. Is there some number that is derived from elsewhere that supports the number of the quote settlement? Your Honor, you're completely correct. They used the Delaware Courts Award, and Mrs. Goldring took that full value and decided, is this going to be sufficient to compensate me for my claim to my stock, or do I want to take this case to appeals? So they used the Delaware Courts value as a means for who's willing to settle for it. And if you look in the record at 1171 and 1172, the consent . . . You say they, you mean the court in Delaware? You said they used . . . Oh, Goldring and Sunbelt, when they negotiated the settlement, they used the values determined by the Delaware . . . oh, when I say they, Mrs. Goldring and her advisors. Mrs. Goldring was the shareholder, but she  had this $40 million settlement in exchange for her claim to her stock. And I think, during the course of the proceedings, they did not have evidence of Sunbelt's value. That was something that the court said he would allow a second stage of discovery if he determined, the Delaware Court, let me clarify. Is there any argument that the value is based somehow on the 2010 status of the stock? In other words, we're talking about capital gains, which would be a snapshot from one time to another. The full amount was paid . . . the origin of the claim doctrine, it says that you look at the claim, so when . . . they didn't have the value of the 2010 Sunbelt. The Sunbelt's 2010 return is in the record in this case. The Goldrings did not have access to it at the time, but it shows that Sunbelt was worth far more than what it ultimately paid her. And in her post-trial brief, Goldring even offered to pay Sunbelt four times the amount that Sunbelt had offered to pay . . . had, you know, the push-out price that Sunbelt had set, which was about $43. Mrs. Goldring had offered to pay four times that amount to acquire all the rest of Sunbelt's share. So there's record . . . there's evidence in the record that the Goldrings viewed the value of Sunbelt to be much in excess of what the court ultimately determined and what they ultimately agreed to. But in their . . . in deciding whether or not to pursue the appeal, to seek that stock on appeal, the Goldrings took the entire $40 million settlement and computed it on a per-share value and said, this comes out to be about $333 a share, and I think that that's sufficient to settle, you know, this claim, my claim that I have for my stock. But that figure was based upon what the Delaware court calculated. Correct. That was the best available information, and I think there's a couple of cases we cite in our briefs. In Indec Energy Corporation, it's a tax court case, and the parties did the same thing there, where the court, you know, came up with a value at the time and then awarded a 10% interest, and the parties ultimately agreed to settle for that amount. And the interest factor was used as a proxy to determine what they would agree to waive their rights to the shares for, what they would agree to sell their shares for. And so that's not an uncommon occurrence, and actually the IRS has taken the position on several occasions that when a company agrees to buy the stock as part of a settlement, and this case specifically is Jordan B. Commissioner, where the primary shareholder agreed to settle the claims brought by minority shareholders and said, I will pay you back what you originally paid for the stock plus 5% interest. And the IRS took the position, well, that 5% interest is not interest for tax purposes, because there's no debt. You don't have a legally enforceable obligation at the time you made that agreement. That's part of your capital asset purchase, and that 5% interest must be treated as capital for tax purposes. Same thing happened in a case called Midkiff, which is also a tax court case, where the parties agreed to, I believe in that case it was a 10% interest factor, and the IRS argued that it should be treated as capital for tax purposes. And that's what, you know, the issue, Your Honor, is correct, that, you know, was this amount paid in exchange for a capital asset? And I think the lower court kind of muddled the issue by saying, well, it's interest because they've called it interest. But in this court, you know, the use of the court does not rely merely on the use of terms. The court has to look at the substance of the payment, and was there a creditor-debtor relationship. And there's no creditor-debtor relationship here. I mean, Mrs. Goldring never agreed to loan Sunbelt any money. She was forced to. She had no choice but to pursue her case in litigation. And in doing so, this was the best option that she had available to finally resolve her claim. Well, she decided that this option was acceptable to finally resolve her claims for her capital asset rather than proceeding, you know, to the courts of appeals, to this Delaware Supreme Court. And how do you distinguish, obviously, the key case is the Kieselbach case. How do you distinguish this matter from what seems to be controlling? Yes, Your Honor. Kieselbach is different because what we have in this case, in a capital asset case, is you have two parties where you have a shifting of the tax burden, which is why, in many cases, IRS says that the payor cannot shift its tax burden to the payee. In the Kieselbach case, which is a condemnation case, you have a government entity. It's a tax indifferent party. The government's not incentivized to underpay. The government's incentivized to pay the party that receives the condemnation proceeds the fair value of their asset. Here, Sunbelt was incentivized to underpay Mrs. Goldring. And Sunbelt is incentivized to treat this interest as interest, even though there's no loan, because that generates a liability. I don't understand, you know, I understand your rhetorical argument about the relative unfairness here. But, in fact, your tax liability, your appliance tax liability, is not dependent on how Sunbelt was able to characterize or treat this, right? Well, I think that's correct, Your Honor. The liability is based on what does she receive the money in exchange for. And it doesn't matter whether Sunbelt got an unfair advantage out of it or not. Yes, Your Honor, that's correct. I think in the international paper case, that's a similar case where the party deducted the interest expense and the IRS permitted that, but then the Court of Federal Claims found that that interest expense was not part, it was a negotiated stock price for the stock and included an interest component. And even though the payor had inappropriately deducted the interest expense, the Federal Court of Federal Claims said this is not interest income for tax purposes because this was part of the consideration paid for the capital asset. You do have another significant issue. I know you want to... Yes, Your Honor. The second issue is whether the IRS can charge underpayment interest on the five million dollars if it's determined that that additional amount is owed. And I'd like to, you know, before I speak, that this five million dollars, which the liability occurred in 2010, that that was paid with the 2010 tax return, and that that money stayed with the IRS during the course of the audit, and the IRS had full possession of use in the funds. The government doesn't dispute that. The government says that two statutes require the gold rings to pay underpayment interest, and those statutes are 6402 and 6513. And what those statutes do is they do not create a liability on behalf of the taxpayer to pay underpayment interest. The reason those statutes are in place are to preclude, is to prevent the IRS from having to pay overpayment interest on overpayments that taxpayers elect to keep with the IRS. So I think in the government's brief they say, you know, taxpayers, you know, overpayment to their own detriment, that's because they can't collect overpayment interest. And the way that those statutes operate, for example, in this case, if at the conclusion of the audit the IRS has found that Mrs. Gold Ring did not owe the additional five million dollars in taxes, 6402 would have credited that money forward in a way that would prevent any interest from accruing on it. So the gold rings could have gotten the money back, but the IRS wouldn't have had to pay them any interest on it. That's overpayment interest. So let me make sure, it's not clear to me anyway in the briefs, they overpaid in 2011, or purportedly overpaid the disputed amount in 2011. So then when their taxes become due, the gold rings taxes become due in 2012 and the successive years thereafter, do I understand correctly that they paid the full amount for each of those years independently, so that they are never short? There's never a shortage where some of this money from 2011 is applied, is that correct? Yes, Your Honor, that's correct. And so I think that the IRS is trying to say that these statutes, you know, prevent that this overpayment from, you know, offsetting any subsequently determined underpayment, but that's not what the courts have held in Sequa and May Department Stores and deal specifically with whether or not the IRS has to pay overpayment interest. And so it's not your position that we would be entering into a circuit conflict if we don't follow Fleet Boston, is that right? I believe that's correct, Your Honor, because I think Fleet Boston, they didn't consider 6621, which required interest netting. And what they said is that we believe these statutes reflect a congressional intent that underpayment interest has to be applied in these situations. One year, right? That you can only have the under, that the netting only occurs one year forward, is that right? Yes. And we think that the legislative history of 6621 shows that Congress doesn't want to unnecessarily charge taxpayers underpayment interest for funds that the IRS doesn't have to pay. Well, I think that argument at least is straightforward. Yes, Your Honor. I'm not sure we have any other, I'm not sure we, the panel has any other questions. Certainly. I'll reserve my last 30 seconds for my rebuttal. Well, five minutes. All right. Thank you, Your Honor. Welcome, Miss Abbott. Thank you, Your Honors. And may it please the court, Julie Aveda for the United States. Taxpayers here have placed themselves in a situation that is entirely of their own making. At every step in this process, they made informed choices. Yeah, they paid the government overpaid interest. What a terrible choice. I wish Jeff Bezos would do that. Many of us wish that, Your Honor. What they did here was they did provide a large payment to the government far in excess of the liability that they reported in 2010. They also made a credit elect, and that was the choice that they now regret, because the effect of the credit overpayment, not used to pay their taxes in 2010, departed that account and went to the following year on the due date of the next year's taxes, April 15th, 2011. Counselor, excuse me, what they were trying to do is to avoid obviously what's exactly happened on this second issue anyway. You have in your brief some alternative that would have worked for them, that doesn't have the statutory barriers that you identify that we'll have to see if we agree with you. Is that really the problem? I'm not casting aspersions, but they didn't do this right back when it got started? They should have created some sort of different account with the IRS? Your Honor, they could have avoided this outcome by choosing different paths. It's not our place to say what is the right choice for a taxpayer. The liability could have been avoided had they, for example, tendered those funds in the first place as a deposit. Their brief implies that they made this overpayment out of an excess of caution in anticipation of potential liability. Well, the IRS has a procedure to follow if you're in that situation. Do you disagree with, I mean, certainly we can look at their returns, determine whether they've been calculated properly as I'm sure the IRS does when they audit somebody if they choose to do so. Is there any disagreement that for 2012 and thereafter, they owed a certain amount of money to the IRS under the tax code, calculated it, assuming they had CPAs involved and calculated, and the IRS said, fine, it's X, and you paid X. Don't we know that now? In 2012? How much were they short in 2012? They were not short in 2013. In 2014? They were not short in 2014. Were they ever short after 2011? The record does not reflect that they were. Okay, so now we have in 2011, they have paid some five million plus dollars, which is the contested amount. Is that correct? There was an overpayment in excess of 6.7 million dollars. Okay, well, forgive me for being, even, it's even more than I thought. So what, so that money is sitting there because it's contested. They think they might owe it, they dispute it, and they pay it. I beg your pardon, Your Honor, the record does not explain why that money is sitting there. It is not contested. Well, it wasn't a charitable donation, was it? It is not explicable on the record. Why would they pay it? You wonder that. Isn't that the point? Isn't that the term of money that they don't have use of? Why would they pay it? That is not what I'm asking you now. You're here for the IRS, for the DOJ. Tell me why they would pay it. Why would the government be entitled to it if you don't consider it a charitable donation to the government? The government is not entitled to it. It remains in their account until it moves to the next tax year, and then it is applied to their liability for that year to the extent needed. In the following year, they also made a credit elect. It moves forward again. Taxpayers directed the government, at every point, to use this money for their purposes. It was in the government's possession, but the government didn't want it. We didn't need it. We could use it for other purposes. But you sure as hell didn't send it back. We needed it later. But that was not what they set it up to do. And if they had, in reality, wished... What is the law that controls this? Because, frankly, I think these two provisions do not compel the result that you are seeking. Alone, they do not, Your Honor. And there are more provisions than those. Okay. That's all we need to say. Alone, they do not. So what does? Well, first, you start with... Those are the beginning conditions, the threshold conditions. You start with 6402B, which says, if you overpay your taxes, you, taxpayer, may elect to credit those overpayments forward for application to future estimated tax liabilities. Not a donation to the government, not for the government to do with as it pleases. You direct the government, pay this to my next year's tax. And the government does. Effective... So 6402B says you may do that. The government does that pursuant to Section 6513D as of the date of the next tax payment due, which is the 15th of April of the following tax year here, the date that you would normally file your taxes and pay. That's when this money departs your account. And that's when a Treasury regulation under 6402, Section 301.6402.3A.5 says, when you make that credit election, no interest shall be allowed on any money that you credit forward. And that's overpayment interest to you on a refund or underpayment interest if there's a balance due. So, like, if that's sitting in the account, we can't collect. And that was the Avon holding, that we can't collect interest. Sounds like a decent rule. So what's the problem when you just roll it forward over five years? What I see is this. The IRS is penalizing these people twice. Now, lay aside the characterization of the transaction, which is even more money, and that's the third penalty. But here they're penalizing twice, because had they not paid this money, they would be in exactly the same position today that you say they are. In other words, they owed the, let's round it off, $5 million underpayment, and they owe the interest, right? But not only, they deprived themselves of the use of that money to the benefit of the U.S. government, and therefore suffered an opportunity cost, because in this ensuing number of years, they could have taken that $5 million and deployed it in a very useful way, and probably, so you are telling them they can't have their $5 million, and they've also given up the opportunity cost. Your Honor, they had a remedy for that throughout the course of these years. You know what? What says, how does it say, what in the IRS regulation says that is the exclusive remedy? There are multiple remedies, Your Honor. I'm not suggesting that one is exclusive. So what's wrong, if all the others would allow them to avail themselves of keeping it, not being charged underpayment interest, why is this sole remedy, when they have a lot of money and the best possible tax advisors, why is this sole remedy showing them to be ineffective or stupid? We can't explain that, Your Honor. No, that was not the government's choice, and that is the point here. It was their decision. No, no, no, no. They're being penalized for their choices, Your Honor. Ma'am, you have yet to explain to us what in the law or the regulations compels them to pay underpayment interest when that money has been out of their control and in the hands of the U.S. government. Section 6601A imposes underpayment interest on any amount of tax that is not paid on or before the last date prescribed for payment. When that assessment date arises, we now know there's a liability. So we look to what they credited, any overpayment in 2010. And you kept the ball, you big IRS, kept the ball in the air for how many years while today? Your Honor, the IRS did not keep the ball in the air. Your Honor, taxpayers had the right to request a refund instead of a credit elect at every year that they filed their taxes. And every year they said, pay it forward, pay it forward, pay it forward. We don't want that money back. The government could not do anything with that money except what they told them. The IRS was not playing in a sandbox with their money. The IRS was acting at their direction pursuant to the statutes. They could have had the use of that money back at any point at their own election. Every year they filed their taxes. They could have asked, oh, gee, we paid six whatever million dollars, by mistake we'd like it back. Would you please send us a check? Yes, Your Honor. They could have done that. So then the IRS would have said, oh, well, now we still believe that you've underpaid. So here's your lawsuit, not in the Eastern District, but in tax court. And, oh, by the way, here's your tax lien that we're going to put on your property. Yes, you would have, sure. You would have a willful underpayment penalty in addition. We would not. Well, don't tell me that because that's a remedy that's available to the IRS. It is indeed a remedy that's available to the IRS, but the audit did not reveal any willful underpayment. I understand that, but had they taken the refund is what I'm saying, and every year credited just in case and then taken a refund, then you'd say, well, that's a deliberate underpayment, so you owe 15 percent more per annum or whatever it is. Clearly that would have been an option, but the audit does not reflect that that determination was made here. I understand that, but I'm saying they had their remedy and they knew you had yours, which included deliberate underpayment penalties, and we'd be right back here in court suing them for what a deliberate underpayment penalty is. Here's a third option, Your Honor, if we're speculating on this. They could have reported the income as interest income on their 2010 return and then filed a refund suit then. We would be in the same posture procedurally that we are now. And that would have been premature, would it not? It would not. It would have been timely because that was when they made the payment, and if they properly reported the interest as interest and then reconsidered and said, actually, we believe that this interest is in lieu of a capital asset, that would be their claim in that timely refund suit in 2010. Couldn't the IRS just say this outright instead of coming in after the fact and saying, well, ha-ha, you screwed up? In other words, if there is a menu of remedies available, some of which are okay and some of which will incur underpayment penalties, like prematurely paying millions of dollars, then why isn't the IRS transparent about that? When these regulations you have acknowledged do not get you there. I'm not sure that I have acknowledged that the regulations are insufficient in any way to determine liability here, Your Honor. Nonetheless, in response to your question, the IRS is as transparent as the code and as transparent as the regs and as transparent as the revenue procedures, and these were sophisticated taxpayers with competent tax counsel who took a position that was well-informed and well-advised. They have come to regret it now because, as it turned out, they didn't make a deposit. They didn't immediately seek a refund suit or make a claim for refund in 2010. They didn't avail themselves of the remedies that would have given them back the use of those funds promptly. They were there. They were available. They could have done that. Nothing in the code or regulations prevented them from recovering the use of their funds promptly, or as promptly as a refund suit takes. Counsel, you may have completed your answer of what else was part of your regulation and statutory authority for your position. It seems to me that your position has some merit, but I'm not sure it's clear enough to say that it's controlling. It seems to me that so far what you've talked about and what I've seen in the briefs is that this is a possible explanation of how this is supposed to work. But it is not done. What you can help me with is, is it done with sufficient clarity? And if so, what are the pieces? And maybe you've tried to go through them and never have quite completed the list. What are you saying the relevant statutory and regulatory elements of your argument are that would have shown these taxpayers that this is what's going to happen at the end of the day? Well, the fact that when you make a credit elect, you say, pay my overpayment forward to my next year's estimated tax and do not refund it to me. Already you are saying, don't give me back my money. You keep it. I may need it later to pay more tax. 6513D, which follows on that, says as soon as you make that election, those funds leave your account. 6601A says when those funds leave your account, that means that there's not a balance on your account such that if we later figure out that you owed tax in year one, that's going to be a deficiency there with no offset in credit because that credit has left. The treasury regulation 64023A5 says once that credit leaves your account, unlike a routine overpayment, you're not going to get interest on that if you file a refund suit later and succeed. Let me suggest to you, you know, my credits, which we take almost every year because our accountant says we're overpaying every year, take about six zeros off of what this amount is here. And, you know, I always assumed, I would never have thought otherwise, that if the IRS were to come back and audit me for five years ago, that somehow that money would not help protect me against the underpayment. And you're saying it wouldn't at all. And let me just suggest to you that since every proposal I've heard about in Congress recently suggests that the IRS is going to be having an incredible amount of money so they can come and audit everybody in the world, including those little fish like us, relatively speaking, that the incentive is going to deprive the government of a great deal of money because nobody is going to try to roll over an overpayment on the threat that they're going to be audited and audited and audited for previous years. I would suspect that this occurrence is less common, the threat of audit influencing people's crediting. Well, the more money Congress appropriates, it's supposed to deliberately be to enhance audits and collection activities. Your Honor, it is your right at the end of every tax year when you file your return to take your refund back. It is your right. You may choose to credit it forward. You may choose to take that money back. You get to make that choice. The IRS isn't going to make it for you. The IRS is not going to penalize you for the choices you make. You have the control of your funds. If you tell the IRS, pay my 2010 overpayment towards my 2011 taxes, another smart choice for you to make would be to reduce your estimated payments in 2011 to absorb that credit. And then you have more money in your pocket to use in 2011 because you've already made a payment towards your next year's taxes from your previous year's overpayment. There are all kinds of ways you can strategically move these chess pieces around in your own taxes. They're up to you. It is all within the taxpayer's power. The government acts at your direction here. And the penalty has nothing to do with what the government is doing with the money in the meantime. Here the underpayment penalty comes from the fact that the taxpayers incorrectly reported their tax in 2010. So do you think that the use of money principle is basically nonexistent anymore? The use of money principle applies per period, and that's the holding in Avon, which is consistent with the outcome here. There's no underpayment interest charged for any time that you have a credit in your account. That's precisely what you're saying the regulations say. Right. So either you're saying so the use of money principle has no purchase beyond the admittedly the regulations that you acknowledge to judge Southwick's astute questioning simply do not cover this situation exactly. There are situations where the use of money principle does apply. But here where a statute says, no, that is deemed paid, it does not. You just told us you never mind. We're repeating ourselves. Why don't you say a few words about why the treatment of the payment for the stock ought to be why in the face of these other cases like Jordan, we ought to not look at the substance instead of the characterization by a district court. This court should look at the substance. And the substance is that this is interest. The Delaware court awarded interest. The parties negotiated a form of implementing order that characterized it as interest and computed it as interest. And Sunbelt reported it as interest consistently with the understanding of the parties up to that time. There was no ambiguity as to the characterization of the payment. The fact that the taxpayer may have used it emotionally as a proxy for a renegotiated valuation doesn't make it part of the actual valuation which was a matter of fact found by the Delaware court. Well, the IRS is a stranger to that proceeding, and therefore it's not binding. The IRS did not make an independent valuation here.  And the IRS had no reason to make an independent valuation here because there was a transaction that was completed and the tax consequences were reported to the IRS. And as you say, we were a stranger. Well, I guess a counterargument to that is that since Sunbelt froze her out and didn't account for the stock for 13 years, the value of the stock was what it was in 2010. No, Your Honor. I think the record is clear, and I think that counsel agrees that the valuation was as of the date of the merger, August 22, 1997, and that it was in fact $114. No, I'm talking about substantively for tax purposes. I'm not sure I understand that. They didn't actually—they froze her out. They didn't actually give her the value that she was owed for the stock. That's correct. But what the interest does there is not—it is not a component of the valuation process. It was not involved in the fact-finding. The Delaware court doesn't look to how much interest they're going to earn over the time it takes me to figure this out to determine what the item was worth in 1997. May I finish? Yes, you can finish your sentence. Thank you. The Delaware statute distinguishes between the valuation process and the awarding of interest in three separate instances. I am out of time, so I won't enumerate them, but they are—throughout the language of the statute, it clearly discusses both how you determine value and how you award interest. If at all, it's discretionary. You don't have to. Value is completely separate from interest there. That is reflected in the court's decision. That is reflected in the party's agreement. That is reflected in their tax reporting. All right. We appreciate your seersucker suit. Okay, Ms. Levin. Thank you. May it please the Court, I just want to make a couple points on the stock and then also on the interest issue. The claim that the $26 million portion of the payment is the time value of $14 million, that just isn't credible. $26 million is not the time value of $14 million over a 13-year period. This money constituted something more than just compensation for not having the stock. And the result that the IRS is advocating is unfair and would encourage companies like Sunbelt to underpay their shareholders, because it's a no-risk proposition. They underpay the shareholder, and then either they get away with it because the shareholder won't bring litigation like Mrs. Goldring, or they can protract the litigation, and then the vast majority of the funds they ultimately have to pay are tax-deductible, and they get a tax benefit, whereas if they had negotiated in good faith for a fair price, they couldn't deduct that amount. They would have to capitalize it. So it may be it is the result, but if it is, that is an unfair result, and it's only going to encourage bad acting on behalf of companies. As far as the underpayment issue, I do want to point out, I neglected to mention earlier, of course, that in this circuit, it was established in 1969 in Vic v. Finney that interest in tax cases is merely compensatory and it's not a penalty. And I think, as your honors are well aware, it's operating solely as a penalty in this case. There was no need to compensate the government because the government had its funds throughout the entirety of the audit. And my good friend suggested that maybe the Goldrings should have filed their return reporting it as interest and then claiming a refund. Well, they should not be required to give up their right to claim the tax treatment as they believe it's appropriate. In addition, there's potential penalties for filing a false return. And they also should be entitled to avail themselves of the tax court proceedings if they want to dispute that. So I believe that in this case that the way that the government has sought to treat underpayment interest is simply unfair. Okay. If there are no further questions from the panel, I will yield my time. Thank you. Thank you.